UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ALEXA N. BRISTOL ) | CIVIL ACTION |
|     Plaintiff ) | |
| ) | |
| v. ) | |
| ) | JURY TRIAL DEMANDED |
| LAKE POCOTOPAUG AUTO, LLC, ) | |
| THEODORE TRUDON, AND ) | |
| CREDIT ACCEPTANCE CORPORATION ) | |
|     Defendants ) | |
| ) | JUNE 26, 2013 |

## COMPLAINT

1. This is a suit brought by a consumer against Lake Pocotopaug Auto, LLC ("LPA") for violations of the Truth In Lending Act ("TILA") 15 U.S.C. §§ 1601 *et seq.*, the Magnuson-Moss Warranty Act (Magnuson-Moss"), 15 U.S.C. §§ 2301 *et seq.,* and for pendent state law claims under Article 2 of the Connecticut Uniform Commercial Code, Conn. Gen. Stat. §§ 2-101 *et seq.,* the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §§ 42-110a *et seq.*, and the Connecticut Retail Installment Sales Finance Act ("RISFA"), Conn. Gen. Stat. §§ 36a-770 *et seq.* Theodore Trudon is named as a defendant because of his fraudulent and deceptive acts. Credit Acceptance Corporation ("CAC") is named as the assignee of the retail installment sales contract and is liable for some of the claims asserted against LPA.

2. Plaintiff, Alexa N. Bristol, is a natural person residing in Maybrook, New York.

3. LPA is a Connecticut limited liability company that operates an automobile dealership in East Hampton, Connecticut.

4. Trudon is a Connecticut resident who resides in Cobalt, Connecticut. He is a member and principal of LPA.

5. CAC is a Michigan corporation with a principal place of business in that state, and it is a finance company that accepts assignment of retail installment sales contracts from dealerships such as LPA.

6. Jurisdiction in this Court is proper pursuant to 15 U.S.C. § 1640(e), 15 U.S.C. § 2310(d)(1)(B), 28 U.S.C. §§ 1331, 1332, and Fed. R. Civ. P. 18(a).

7. This Court has jurisdiction over LPA because it is organized under the laws of this state and regularly conducts business in this state.

8. This Court has jurisdiction over Trudon because he is a Connecticut resident.

9. This Court has jurisdiction over CAC because it regularly conducts business in this state by accepting assignment of retail installment sales contracts from Connecticut dealerships.

10. Venue in this Court is proper, because LPA and Trudon are residents of this state and the acts complained of occurred in this state.

11. In April 2013, Plaintiff became interested in purchasing a motor vehicle, and she saw an internet advertisement by LPA for a 2002 Mini Cooper 2D Hatchback (the "Vehicle").

12. Plaintiff traveled to LPA to look at the Vehicle, and she met with Trudon and asked to see the Vehicle.

13. The Vehicle did not have the Federal Trade Commission Used Car Guide as required by 16 C.F.R. Part 455, a *per se* violation of CUTPA.

14. Plaintiff asked Trudon if she could test drive the Vehicle.

15. Trudon had difficulty starting the Vehicle for a test drive, and he commented that he did not believe the problem was the battery because he had just put a new battery in the car. He said that the problem might be the starter, and he told Plaintiff: "The car hasn't gone through 'Safety' yet, so those are all things that will be taken care of, so don't worry about it."

16. Trudon initially insisted that he drive the Vehicle himself for a test drive, stating that he was not comfortable letting her drive it before it had been through "Safety."

17. Trudon played music at a loud volume during the test drive, which Plaintiff believes and therefore alleges he did in an attempt to mask unusual noises made by the Vehicle that would indicate the existence of a problem.

18. Despite the loud music, Plaintiff could hear a strange loud noise, and she questioned Trudon about it.

19. Trudon responded that he had already told her that the Vehicle had not been through "Safety" yet and that she should not worry because any problems would be taken care of at that time.

20. After the test drive, Plaintiff met with Elvis Herrera, LPA's finance manager.

21. Plaintiff and Herrera discussed the amount that Plaintiff could afford for a monthly payment and for a down payment. Specifically, Plaintiff told Herrera that she could pay $3,700 as a down payment and that she did not want payments to be more than about $200 per month.

22. Herrera indicated that she could be approved for credit on those terms.

23. Plaintiff told Trudon and Herrera that she would need to pick up the Vehicle by Monday, April 29.

24. Plaintiff was unable to take delivery of the Vehicle on April 29, because, according to Herrera, CAC required that the Vehicle first be registered to Plaintiff in New York.

25. LPA sent a representative to meet Plaintiff at the New York motor vehicle department in Newburgh, NY to arrange for the registration of the Vehicle, and that representative drove Plaintiff to LPA in East Hampton to pick up the Vehicle.

26. As Plaintiff arrived, Trudon was washing the Vehicle, and she asked him whether the noise issue had been resolved.

27. In response, Trudon said "Oh, Baby, everything is good!"

28. Plaintiff then began to meet with Herrera to execute contract documents for the Vehicle.

29. At some point during this process, Trudon left LPA for the day.

30. By the time contract documents were ready to sign, it was already after 7:00 pm, and Herrera rushed her through signing the documents, which documents included the retail installment sales contract.

31. Plaintiff paid Herrera the remaining $3,200 of the down payment for the Vehicle.

32. Unbeknownst to Plaintiff, the retail installment sales contract reflected a down payment of only $3,500 and not the full $3,700 that she had paid, a violation of TILA and RISFA.

33. Plaintiff then started the Vehicle and began to drive off of LPA's lot.

34. Before Plaintiff even made it past LPA's driveway, she noticed the loud noise that she had heard during the test drive, and she stopped the Vehicle and informed Herrera and asked him to examine the Vehicle and to drive it to see if it is functioning properly.

35. Herrera acknowledged the noise and told her that it appeared to be coming from under the shifter. He told her that the Vehicle was shifting fine and that it should be alright for her to take home. He told her that she should bring the Vehicle back on her next day off and that she should call him to discuss it the next day.

36. Herrera also told her that any repairs could be covered under the service contract and that, even though preexisting conditions are not usually covered, she should not worry about it because LPA "has a guy" that can get cars repaired under those circumstances. Herrera also promised her that LPA would cover the cost of the deductible under the service contract.

37. At this point, it was becoming dark, and Plaintiff was 120 miles away from home with no other vehicle to drive back.

38. In reliance upon Herrera's assurances, Plaintiff began the trip home.

39. During the trip, Plaintiff noticed that the Vehicle's speedometer was stuck at 50 mph. Plaintiff also experienced problems with the transmission, and she observed that the Vehicle was not steering properly, and that interior lights would not shut off.

40. Plaintiff called Trudon's cell phone twice during the trip home and left voicemail messages, but Trudon never returned her call.

41. The next day, Plaintiff brought the Vehicle to an independent repair shop that conducts safety inspections for New York. She learned that the transmission needed to

be replaced, the exhaust was defective, there was a power steering leak, and the rear tires just barely had the minimum required tread.

42. The cost to repair these defects would be well in excess of the Vehicle's value.

43. Plaintiff also learned that the Vehicle had been in an accident and that the quality of the paint job was very poor.

44. On May 1, Plaintiff returned the Vehicle to LPA and demanded a refund of her money.

45. Trudon had the Vehicle taken to LPA's garage, where it was placed on a lift.

46. One of LPA's mechanics's inspected the Vehicle, and Plaintiff could hear the mechanic pointing out some of the Vehicle's defects to Trudon.

47. Trudon noticed that Plaintiff was present, and he began to yell at her and told her that she needed to leave the property immediately, even though the Vehicle was still on a lift in LPA's garage.

48. Trudon also told her that the Vehicle was not defective and that LPA would not take any responsibility for any repairs.

49. Plaintiff refused to leave and demanded that LPA refund her money.

50. Trudon called the local police, who required her to leave, even though the Vehicle was still at the dealership.

51. On May 3, Plaintiff, by her attorney, notified LPA in writing that Plaintiff had revoked acceptance of the Vehicle and demanded a return of the $3,700 that she had paid.

52. LPA has breached the implied warranty of merchantability under Conn. Gen. Stat. § 42a-2-314 because the Vehicle was not fit for the purpose for which motor vehicles are ordinarily used and because the Vehicle was not roadworthy.

53. LPA made express warranties regarding the condition of the Vehicle within the meaning of Conn. Gen. Stat. § 42a-2-313 that have been breached.

54. LPA engaged in material misrepresentation and fraud misrepresentations that provide Plaintiff with the same remedies as she would have for breach of warranty pursuant to Conn. Gen. Stat. § 42a-2-721.

55. LPA is liable to Plaintiff under Article 2 of the UCC and Magnuson-Moss for her damages.

56. In addition to her claim for a return of her $3,700, Plaintiff also suffered consequential damages in the form of several trips to and from Connecticut and the cost of the inspection by Midas.  Additionally, because she has been unable to purchase another vehicle due to the wrongful detention of her down payment, Plaintiff has incurred significant expenses for transportation, and she has experienced difficulty attending her work as a waitress, causing her to lose shifts and income.

57. LPA's breaches of warranty were tortuous in nature, in bad faith, were wanton and malicious, outrageous, and were undertaken with bad motive and with a reckless indifference to Plaintiff's interests and the injury that she sustained, entitling her to common law punitive damages, which are estimated to exceed $50,000.

58. Plaintiff is also entitled to statutory damages of $2,000 under TILA for LPA's violation of that statute.

59. As an alternative to her claim of revocation of acceptance, Plaintiff asserts entitlement to a rescission of the contract because of the violation of RISFA.

60. LPA and Trudon have engaged in unfair and deceptive acts in violation of CUTPA, and they are liable to Plaintiff for her actual damages and for punitive damages.

61. LPA and Trudon have engaged in acts of fraud and misrepresentation and are liable to Plaintiff for actual damages and common law punitive damages.

62. CAC was the assignee under the retail installment sales contract and, under the terms of the contract, was liable to Plaintiff in an amount up to the $3,700 that she has paid.

63. Additionally, pursuant to Conn. Gen. Stat. 52-572g, Plaintiff's written demand to LPA made CAC liable to Plaintiff for her damages for an additional amount that included the unpaid balance due under the contract as of the date that Plaintiff asserted claims against CAC.

64. CAC has, despite demand, failed and refused to reimburse Plaintiff to the full extent of its liability for LPA's breaches of warranty, unfair trade practices, fraud, and deception.

WHEREFORE, Plaintiff claims actual damages, statutory damages, common law punitive damages, and statutory punitive damages, and attorney's fees.

                              PLAINTIFF ALEXA N. BRISTOL,

By: /s/ Daniel S. Blinn
     Daniel S. Blinn, ct02188
     Hailey R. Gallant, ct29150
     dblinn@consumerlawgroup.com
     hgallant@consumerlawgroup.com
     Consumer Law Group, LLC
     35 Cold Spring Road, Suite 512
     Rocky Hill, CT  06067
     Tel. (860) 571-0408
     Fax. (860) 571-7457